# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-23-00186-CR

**The State of Texas, Appellant**

**v.**

**Michael Ruscoe, Appellee**

## FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
## NO. D-1-DC-21-900025, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our previous opinion and judgment issued March 21, 2025, and substitute the following opinion and judgment in their place. We deny the State's motion for rehearing.

The State of Texas appeals from the district court's order granting a new trial to appellee Michael Ruscoe, who was convicted of murder. In its sole point of error, the State asserts that the district court abused its discretion in granting a new trial. We will affirm the trial court's order.

## BACKGROUND

The State charged Ruscoe with intentionally or knowingly causing the death of Derrick Amoriko by shooting him with a firearm. Some of the circumstances surrounding the shooting were undisputed at trial, including that the shooting occurred during a child-custody

dispute between Amoriko and Ruscoe's then-girlfriend, Ruth Berny (who is now Ruscoe's wife), involving Amoriko and Berny's three-year-old daughter. On the day of the shooting, Ruscoe drove Berny to Amoriko's house with the intent to take custody of the child, who was staying with Amoriko at the time. When they arrived at the house and confronted Amoriko, an argument ensued. During the argument, Amoriko attempted to leave his house with the child in his vehicle. Ruscoe and Berny were able to get into the vehicle before Amoriko drove away, and Amoriko proceeded to drive erratically through his neighborhood before returning to his house, parking in the garage, and exiting the vehicle, yelling at Ruscoe and Berny to get out of his car. Amoriko then attacked Ruscoe and Berny with a sledgehammer, striking Ruscoe in the leg with it. Ruscoe then ran to his vehicle that was parked on the street, retrieved a handgun, and ran back toward the garage, where Amoriko, Berny, and the child were still located. Shortly thereafter, Ruscoe shot Amoriko in the chest, killing him.

Ruscoe's vehicle had a dash camera that recorded some of the events immediately before, during, and after the shooting. The camera was facing the street and did not show the garage, so there was no video recording showing the shooting itself. However, the video recording did show Ruscoe running toward his vehicle, retrieving the gun, and running back toward the garage. Additionally, on the audio portion of the recording, Berny can be heard screaming and crying, Amoriko can be heard yelling at Ruscoe and Berny to get out of his car, and then, after Ruscoe had retrieved the gun, Ruscoe can be heard telling Amoriko, "Back the fuck up." Amoriko asked Ruscoe, "Are you going to shoot me on my own property?" Ruscoe responded, "I will." Then a gunshot can be heard. Immediately after that, Ruscoe can be heard yelling, "Back the fuck up! Back the fuck up! Let her go!" Finally, before the recording ends, Berny can be seen running toward Ruscoe's vehicle, holding the child.

2

The central issue at trial was whether Ruscoe was justified in shooting Amoriko. The defense's theory of the case was that Ruscoe shot Amoriko in either self-defense or Berny's defense. Ruscoe and Berny each testified that before Ruscoe shot Amoriko, Amoriko had grabbed Berny by her hair and throat and had her in a chokehold. Berny also testified that Amoriko was threatening to kill them while he attacked them with a sledgehammer. Ruscoe testified that he believed Amoriko was going to kill either him or Berny if Ruscoe "didn't do something."

The State's theory of the case was that Amoriko was not attacking anyone when Ruscoe shot him. A neighbor who had witnessed the shooting from a few houses down and across the street from Amoriko's house testified that before Ruscoe shot Amoriko, Amoriko stood "with his hands down to his side, like what's up." According to this neighbor, Berny was located "about three and a half feet away from" Amoriko, "just standing there" and holding the child. Another neighbor who also witnessed the shooting from the nearby house testified similarly.[1]

The State charged Ruscoe with the murder of Amoriko, and the jury received instructions on self-defense, defense of a third person, and necessity. The jury found Ruscoe guilty of murder as charged. Following the hearing on punishment, the district court found that Ruscoe had acted under the immediate influence of sudden passion arising from an adequate

---

[1] The two neighbors, along with a third neighbor, were standing outside and on or near the neighbor's driveway when the shooting occurred. The view from the neighbor's garage could be seen on a video recording taken from one of the neighbors' security cameras. A portion of Amoriko's driveway is visible from the camera, and Ruscoe can be seen running to his car and then running back up the driveway. Then, yelling and screaming can be heard, followed by a gunshot. However, the shooting itself cannot be seen from the camera angle.

3

cause, which reduced the offense to a second-degree felony, and sentenced him to the statutory minimum of two years' imprisonment. *See* Tex. Penal Code § 19.02(d).

Ruscoe filed both a notice of appeal and a motion for new trial that he later amended. In the amended motion, Ruscoe raised ten grounds for granting a new trial: ground one alleged that the State failed to discover and disclose Amoriko's previous acts of violence and other bad acts committed against Berny and other women, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963); grounds two through nine alleged that trial counsel was ineffective for failing to investigate and present to the jury Amoriko's previous bad acts and other evidence; and ground ten alleged that Ruscoe was "actually innocent" of the charged offense based on newly discovered evidence.

All the claims were based on evidence that was not presented to the jury during trial, either because "it was not disclosed by the prosecutors, because it was not discovered by trial counsel, or because it was not presented by trial counsel." Ruscoe alleged that the following evidence (admitted at the motion-for-new-trial hearing as Defense Exhibits A through G), was "not disclosed by prosecutors, nor discovered by trial counsel, until after sentencing":

The information in Austin Police Department ("APD") offense report GO# 2019-1891242, relating to Amoriko assaulting Berny (contained in Exhibit A);

The information in APD offense report GO# 2015-3440056, relating to Amoriko assaulting a woman named Rachel Legsdin (contained in Exhibit B);

The information in APD offense report GO# 2014-5045822, relating to Amoriko screaming at a female employee to the degree she called 311 (contained in Exhibit C);

The information in APD offense report GO# 2006-1961536, relating to Amoriko

4

harassing Lori King after she broke up with Amoriko and moved out (contained in Exhibit D);

The information in APD offense report GO# 2003-2150233, relating to Amoriko assaulting his wife, Tatyana (contained in Exhibit E);

The information in APD offense report GO# 2003-2370299, relating to Amoriko appearing at Tatyana's residence and frightening her to the degree she called the police (contained in Exhibit F).

The information in APD offense report GO# 2003-5013463, relating to the issuance of a protective order prohibiting Amoriko from committing family violence, communicating with Tatyana in a threatening or harassing manner, or going within 200 yards of Tatyana or her residence (contained in Exhibit G).

Ruscoe further alleged that trial counsel either failed to present to the jury or failed to investigate the following evidence:

The information in APD offense report GO# 2020-1610322, relating to Amoriko assaulting Ruscoe by pepper-spraying Ruscoe on June 9, 2020. This evidence was known to trial counsel but was not presented at trial;

A video, created by Amoriko, of the assault on Ruscoe described in APD offense report GO# 2020-1610322. APD Sergeant Nathan Sexton reviewed this video as part of his investigation, and he found Amoriko to be the initial physical aggressor. This evidence was known to trial counsel but was not presented at trial;

The information contained in the affidavit of Berny, describing numerous verbal, physical, and sexual assaults by Amoriko during their relationship. Based on the undersigned's investigation, it appears trial counsel was generally aware that Amoriko had assaulted Berny prior to trial, but was not aware of the specific incidents described in the affidavit;

The information contained in the affidavit of Amanda de la Llata, stating that [the child] made statements on August 15, 2020, about [Amoriko] planning to hurt or kill Berny. These statements were "so highly disturbing that [Ms. de la Llata] felt

5

a duty to warn [Berny]" of imminent danger. Trial counsel did not interview Ms. de la Llata prior to trial, and this information was not known to trial counsel until after sentencing;

The information contained in the public records of guardian ad litem Cynthia Gonzalez, who testified at trial. These records indicate [the child] made statements on August 17, 2020, about [Amoriko] planning to hurt or kill [Ruscoe]. These records were contained in the discovery provided to trial counsel, but trial counsel did not present the records as evidence;

The information found in the report of forensic psychologist Mollimichelle Cabeldue. The report indicates [Ruscoe] suffers from post-traumatic stress disorder ("PTSD") as a byproduct of his military service in Iraq. The report also indicates [Ruscoe]'s PTSD symptoms increased after [Amoriko] pepper-sprayed him on June 9, 2020. The report further indicates [Ruscoe]'s PTSD likely impacted his thoughts and actions during the incident on August 26, 2020. This information was not discovered by trial counsel prior to trial;

The information contained in the affidavit of Agnes Ruscoe, [Ruscoe]'s mother, indicating that statements made by [Ruscoe] during the incident on August 26, 2020, were similar to statements [Ruscoe] made while experiencing a nightmare after he returned home from Iraq. This information was not discovered by trial counsel prior to trial.

The district court held a two-day evidentiary hearing on the motion, at which several witnesses testified, including:

Berny, who testified that Amoriko had assaulted her on multiple occasions during their dating relationship;

Kyia White, Amoriko's ex-girlfriend who dated him for almost three years and who testified that during their relationship, Amoriko was violent toward her and hit her with objects, including a remote control that he threw into her face;

Ruscoe, who testified that trial counsel had advised against bringing up certain information during trial, including Amoriko's prior assaults against Ruscoe and Berny;

6

Dr. Mollimichelle Cabeldue, a licensed psychologist who performed a psychological evaluation on Ruscoe, determined that he suffered from PTSD due to his military service in Iraq, and opined that Ruscoe's PTSD "impacted his behavior at the time of the offense";

Amanda de la Llata, a licensed professional counselor and registered play therapist who provided play-therapy services to the child during the custody proceedings and who testified that the child made concerning statements during therapy including, "I'm going to kill your mom" and "I'm going to shoot your mom," which "were things [the child] had reported had occurred at dad's house" and that de la Llata "felt . . . was along the lines of somebody had been talking to her about something like this or had been playing out this scenario with her possibly";

Cynthia Gonzalez, the guardian ad litem for the child during the custody proceedings between Amoriko and Berny, who testified that the child had made concerning statements to her approximately one week before the shooting indicating that the child's father wanted to "kill" Ruscoe;

Ruscoe's trial counsel, who testified extensively about her trial preparation, strategy, and decisions in the case, including her decision to focus on the circumstances surrounding the shooting rather on any extraneous offenses involving Amoriko;

The lead prosecutor in the case, who acknowledged that his office did not disclose the APD offense reports contained in Exhibits A through G, although he also testified that his office did disclose "the APD summary that references" those reports.

At the conclusion of the hearing, the district court granted Ruscoe a new trial "in the interest of justice," finding that Ruscoe's "substantial rights had been violated." The district court did not issue findings of fact or conclusions of law. This appeal by the State followed.[2]

---

[2] After the State filed its notice of appeal, we abated Ruscoe's appeal pending our disposition of the State's appeal. *See Ruscoe v. State*, No. 03-23-00034-CR, 2023 WL 2718448, at *1 (Tex. App.—Austin Mar. 31, 2023, no pet.) (mem. op., not designated for publication).

7

# STANDARD OF REVIEW

"We review a trial court's grant or denial of a motion for new trial for an abuse of discretion." *State v. Gutierrez*, 541 S.W.3d 91, 97-98 (Tex. Crim. App. 2017) (citing *State v. Herndon*, 215 S.W.3d 901, 906–07 (Tex. Crim. App. 2007)). "The court abuses its discretion only if its ruling is not supported by any reasonable view of the record." *Id.* at 98 (citing *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012)). "When deciding whether a trial court erred in granting a new-trial motion, we view the evidence in the light most favorable to the court's ruling and give almost total deference to the court's findings of historical fact." *Id.* "When the court does not issue findings of fact, however, we will imply findings necessary to support the ruling if they are reasonable and supported by the record." *Id.* "We will affirm the trial court's action if it is correct on any theory of law applicable to the case and supported by the record." *State v. Moore*, 240 S.W.3d 324, 327 (Tex. App.—Austin 2007, pet. ref'd).

"A trial judge has discretion to grant or deny a motion for new trial 'in the interest of justice,' but 'justice' means in accordance with the law." *Herndon*, 215 S.W.3d at 907. Thus, "the trial court does not have discretion to grant a new trial unless the defendant shows that he is entitled to one under the law." *Id.* A trial court generally would not abuse its discretion in granting a motion for new trial in the interest of justice if the defendant: "(1) articulated a valid legal claim in his motion for new trial; (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights under the standards in Rule 44.2 of the Texas Rules of Appellate Procedure." *Id.* at 909.

**DISCUSSION**

The State's failure to disclose evidence, ineffective assistance of counsel, and actual innocence based on newly discovered evidence are all valid legal claims that may be raised in a motion for new trial. *See State v. Thomas*, 428 S.W.3d 99, 106-07 (Tex. Crim. App. 2014). Accordingly, if the district court would not have abused its discretion in granting a new trial on any one of these claims, we must affirm the trial court's order. *See Moore*, 240 S.W.3d at 327; *State v. Williams*, 83 S.W.3d 371, 373 (Tex. App.—Corpus Christi-Edinburg 2002, no pet.).

We will focus our analysis on Ruscoe's claim that the State failed to disclose evidence in violation of *Brady* and its progeny. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Since *Brady*, the Supreme Court has held that "the duty to disclose such evidence is applicable even though there has been no request by the accused and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (internal citations omitted). The Supreme Court has also held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

"Favorable" evidence is any evidence that, if disclosed and used effectively, "may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Exculpatory evidence may justify, excuse, or clear the defendant from fault, while

impeachment evidence is that which disputes or contradicts other evidence." *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2005).

"The nondisclosure of favorable evidence violates due process only if it is 'material' to guilt or punishment." *Diamond v. State*, 613 S.W.3d 536, 546 (Tex. Crim. App. 2020). "Evidence is material only if there is a reasonable probability that, had it been disclosed, the outcome of the trial would have been different." *Id*. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "Materiality is determined by examining the alleged error in the context of the entire record and overall strength of the state's case." *Diamond*, 613 S.W.3d at 546. "The suppressed evidence is considered collectively, not item-by-item." *Id*.

**The State failed to disclose the offense reports**

The State first argues that it satisfied its duty of disclosure because it disclosed to trial counsel (1) the "APD summary" of any involvement that Amoriko ever had with APD; (2) more than 50 offense reports involving Ruscoe, Berny, and Amoriko under the description "Extraneous reports – Derrick Amoriko.zip"; and (3) CPS records summarizing Berny's reports of abusive behavior on the part of Amoriko. Regarding the "APD summary" of Amoriko's involvement with APD, that summary does not contain the descriptive, exculpatory information that is contained in the offense reports. Trial counsel, who had extensive experience as a former prosecutor, explained the deficiencies with the summary at the new-trial hearing:

> What the APD summary refers to is any time that APD has registered Derrick Amoriko's name in some sort of police involvement. It could be as simple as he witnessed a hit and run. It could be as simple as he called in, you know, he saw a burglar or something. It could be a ticket he received. It can be he's the perpetrator of an offense. It can be every single 911 call Ruth could have ever

10

made. It doesn't distinguish whether a report was made. It doesn't distinguish whether an actual investigation was done. It does not distinguish whether witness statements were taken. It does not distinguish who the alleged victim is if it's a violent crime. So even in the references to Mr. Amoriko as perpetrator or complainant or whatever, it does not differentiate between this alleged offense report and any other. It simply quantifies the amount of time his name was entered into the system by APD. So there's no information in that summary that would notify someone that there are several other victims of a similar crime out there.

The APD summary was admitted at the new-trial hearing, and the document is consistent with trial counsel's description of it. Additionally, the lead prosecutor acknowledged that his office did not disclose the APD offense reports contained in Exhibits A through G. The district court would not have abused its discretion in concluding that the State's disclosure of the APD summary without the corresponding offense reports failed to comply with the requirements of *Brady*. *See Banks v. Dretke*, 540 U.S. 668, 695 (2004) (rejecting contention that "defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed").

Regarding the zip file containing the offense reports that the State did disclose, that file and any documents contained therein were not admitted at the new-trial hearing and is not included in the appellate record. We do know, however, that it did not contain Defense Exhibits A through G as the State admitted as much during the hearing on the motion for new trial. *See Madden v. State*, 242 S.W.3d 504, 515 (Tex. Crim. App. 2007) (stating that appellate court "cannot rely upon the purported contents of some exhibit" that is not included in appellate record).

Regarding the CPS records, only an excerpt from those records was admitted at the new-trial hearing, and that excerpt contains only limited information regarding Amoriko's

11

alleged assault of Berny and makes no mention of the police report regarding the assault that the State failed to disclose. However, trial counsel testified at the new-trial hearing that she was aware of Amoriko's previous assault of Berny that was associated with that offense report but chose not to present that evidence at trial. Accordingly, because that evidence was already known to the defense, the State did not have an affirmative duty under *Brady* to disclose it. *See Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). On the other hand, as Ruscoe correctly observes, there is no indication in the record that trial counsel was aware of any of the other offense reports involving other women that the State failed to disclose.

The State next argues that it was not required to disclose the offense reports because they would have been inadmissible at trial as extraneous offenses "with no relevance apart from its tendency to prove the victim's character conformity." *See* Tex. R. Evid. 404(b) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) ("A prosecutor does not have a duty to turn over evidence that would be inadmissible at trial."). More specifically, the State argues that the evidence would have been admissible only if Amoriko's behavior was "ambiguously" aggressive, which the State contends was not the case here. *See Thompson v. State*, 659 S.W.2d 649, 653-54 (Tex. Crim. App. 1983) (explaining that when victim's behavior is "ambiguously" aggressive, "evidence concerning the deceased's violent character or prior specific acts of violence committed by him are admissible in so far as they tend to explain the deceased's conduct" and are "probative of 'who was in fact the aggressor' in the fray").

However, the district court would not have abused its discretion in finding that Amoriko's behavior was ambiguous. The evidence at trial showed that Ruscoe and Berny came

12

to Amoriko's house unannounced and tried to take custody of Berny and Amoriko's daughter, who was in Amoriko's vehicle at the time. The State, relying on this evidence, argued that Ruscoe and Berny were the first aggressors during the incident and that Amoriko was defending his property and his daughter from them. In contrast, Ruscoe's theory of the case was that Amoriko attacked Ruscoe and Berny first. In light of these competing theories, it would not have been outside the zone of reasonable disagreement for the district court to find that evidence of Amoriko's prior acts of violence would be admissible to explain Amoriko's conduct and determine whether he was in fact the first aggressor as Ruscoe contended. *See Torres v. State*, 117 S.W.3d 891, 895 (Tex. Crim. App. 2003) ("The proper predicate for the specific violent prior act by the deceased is some act of aggression that tends to raise the issue of self-defense, which the violent act may then help clarify."). Additionally, the district court would not have abused its discretion in finding that the evidence would have been admissible for non-character-conformity purposes, including to rebut the State's theory that Ruscoe and Berny were lying about Amoriko assaulting Berny when Ruscoe shot him. *See De La Paz v. State*, 279 S.W.3d 336, 344-48 (Tex. Crim. App. 2009); *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *see also* Tex. R. Evid. 404(a)(3)(A) ("In a criminal case, subject to the limitations in Rule 412 [pertaining to a victim's previous sexual conduct], a defendant may offer evidence of a victim's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it.").

**The offense reports were "favorable" to Ruscoe**

The district court also would not have abused its discretion in finding that the evidence was favorable to Ruscoe. The offense reports tended to show that Amoriko had assaulted and been abusive to women in the past. Specifically, Exhibit B described an alleged

13

assault of a woman by Amoriko in which he grabbed her injured left arm, dragged her out of their house, and hit her in the face; Exhibit C described an incident in which Amoriko "verbally abused" one of his female employees at his massage parlor by telling her to "fuck off" and threatening to fire her after she took a break; Exhibit D described a report of Amoriko harassing a woman by "banging on her door," threatening to "get a warrant for her arrest," and calling her several times nonstop; and Exhibits E, F, and G involved the history between Amoriko and his ex-wife, including a police report of an incident in which Amoriko pushed her and damaged her purse during a "scuffle" over possession of their dog and documentation showing that Amoriko's ex-wife successfully obtained a protective order against him that prohibited Amoriko from, among other things, committing acts of family violence against her, communicating with her in a threatening or harassing manner, and going within 200 yards of her residence or place of business. This evidence, if disclosed and used effectively, may have made the difference between conviction and acquittal in that it would have provided additional support to the defense's theory that Ruscoe shot Amoriko in defense of Berny. *See Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992).

The State argues that the offense reports were not favorable to Ruscoe because they "reinforced" the State's theory of the case, specifically that Ruscoe and Berny were the initial aggressors during the incident and that Ruscoe had a motive to shoot Amoriko.[3] The State

---

[3] The State is referring specifically to Exhibit A, the offense report describing Amoriko's previous assault of Berny, and Exhibit I, the offense report describing Amoriko's alleged assault of Ruscoe with pepper spray. These exhibits are more applicable to Ruscoe's claim of ineffective assistance of counsel than to his *Brady* claim. As discussed above, trial counsel was aware of Amoriko's previous assault of Berny but chose not to present that information during trial, and trial counsel also acknowledged during the new-trial hearing that she was aware of the pepper-spray incident but again chose not to present that information to the jury. To the extent that these exhibits are applicable to Ruscoe's *Brady* claim, although they contain some

14

also discounts the evidence involving Amoriko's abusive conduct toward other women for various reasons, including that one of the victims did not wish to pursue charges against him, that another incident involved "only verbal abuse" against a woman, and that Amoriko's ex-wife sustained "no visible injuries" after Amoriko pushed her during the "scuffle" over their dog. However, we are to view the evidence in the light most favorable to the district court's ruling, and seen in that light, the evidence was favorable to Ruscoe. *See State v. Johnson*, 663 S.W.3d 776, 783-84 (Tex. App.—Dallas 2021, pet. ref'd) (explaining that appellate courts are not to "reconsider" trial court's ruling on motion for new trial by "imposing our own view of the evidence" but instead determine whether ruling was "within the zone of reasonable disagreement").

**The offense reports were "material"**

As stated above, suppressed evidence is material when there is a reasonable probability that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. However, the Supreme Court has cautioned that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he

---

information that could be considered unfavorable to Ruscoe by providing him with a motive to shoot Amoriko, they also contain information favorable to him in that they tend to show that Amoriko had assaulted both Ruscoe and Berny in the past, which would support Ruscoe's claim that Ruscoe was defending himself and Berny from Amoriko. *See Sellers v. Estelle*, 651 F.2d 1074, 1076-77 (5th Cir. 1981) (explaining that offense reports can be favorable to defendant even when they contain evidence that is both inculpatory and exculpatory).

15

received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id*. (quoting *Bagley*, 473 U.S. at 678). Stated another way, "[t]he reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quoting *Kyles*, 514 U.S. at 435).

The State argues that the offense reports were not material because of the strength of the State's case, including the physical evidence and the eyewitness testimony of the neighbors who observed the shooting. However, there was physical evidence supporting both the State's theory and the defensive theory of the case. On one hand, the evidence showed that Ruscoe shot Amoriko in the chest, which undermined Ruscoe's testimony that Amoriko had Berny in a chokehold against his chest when Ruscoe shot him, and there was no evidence of Berny suffering any injuries to her neck despite her and Ruscoe's testimony that Amoriko had his hands around her neck. On the other hand, the police found and photographed multiple strands of dark hair, consistent with Berny's hair color, in Amoriko's hands when they searched his body, which supports the defensive theory that Amoriko had grabbed Berny by her hair and throat when Ruscoe shot him.

As for the two neighbors who saw the shooting, they were standing across the street and a few houses away from where the shooting occurred, and their testimony was inconsistent regarding the distance between Amoriko and Berny at the moment Ruscoe shot Amoriko, with one neighbor testifying that Berny was standing approximately three and a half feet away from Amoriko, while the other testified that Berny was 18 inches to two feet away

16

from him. Both witnesses also acknowledged that they did not see everything that occurred immediately before the shooting. Both neighbors, however, heard a woman scream, and one neighbor saw Amoriko smashing his vehicle with a sledgehammer. In sum, although there was evidence that supported the State's theory that Ruscoe shot Amoriko in cold blood, other evidence supported the defensive theory that Ruscoe was defending Berny from Amoriko when he shot him.

In this murder trial, where the pivotal issue was whether Ruscoe was justified in shooting Amoriko, the State failed to disclose multiple offense reports involving Amoriko that would have placed the case in an entirely different light in the eyes of the jury. These reports included evidence that Amoriko: (1) got into an argument with one woman who was trying to leave his residence and grabbed her left arm, which was recently injured from skateboarding, and dragged her out of the house and hit her in the face; (2) had "an ongoing problem with verbally abusing his staff" at a massage parlor and was "verbally abusive" to a female employee whom he supervised, telling her to "fuck off" after she took a water break; (3) had showed up at the residence of an ex-girlfriend "banging on the door" and causing a disturbance after sending her repeated text messages and phone calls; (4) had showed up "very intoxicated" at the residence of his then-wife a few days after he had moved out and damaged her purse, "they got into a scuffle over possession of the dog," and "during this dispute she was pushed by [Amoriko]" to such a degree that he caused her shoulder pain; and (5) had been subject to a protective order preventing him from committing acts of family violence against his then-wife, communicating directly with a member of her family or household in a threatening or harassing manner, and going within 200 yards of the residence or place of employment of a member of her family. Considering this evidence collectively, it paints a picture of a man who has a history of engaging in violence

17

against women, which, if known to the jury, would have strengthened Ruscoe's defense that Amoriko was assaulting Berny at the time he shot him.  As trial counsel explained at the hearing on the motion for new trial, when asked why she did not present evidence of Amoriko's extraneous offenses,

> Because at the time I was only aware of [Berny's] allegations and not of anyone else's.  I was concerned that [the jury] would overanalyze each one of her allegations before they got to what happened that day between [Amoriko], [Berny], and [Ruscoe].  So because I was under the impression at the time that the only prior allegations of violence against women were by [Berny], I did not want to focus on that.  Again, had I known that there were several women who [Amoriko] had assaulted, I would have changed that decision because I think there would have been potential for more witnesses, potential for more corroboration, and I think I would have made a different choice had I known that.

Counsel further testified,

> I think the theory that we were operating on is we did not want to misconstrue that there could be a motive for [Ruscoe] to be angry at [Amoriko] for how he treated [Berny] in the past.  And so I did not want to entirely rely on his history of violence towards [Berny] because I didn't want it to be misconstrued by the State as a motive.  Had I known there were several other women that he had been violent towards and it would not be specific to [Berny], it would be a pattern of conduct of violence towards women, I would have altered that presentation.

The jury, however, was not presented with Amoriko's "pattern of conduct" because of the State's failure to disclose the offense reports, and that could have reasonably undermined the district court's confidence that Ruscoe received a fair trial.  Accordingly, the offense reports are material.  On this record, we conclude that the district court did not abuse its discretion in granting Ruscoe's motion for new trial on the ground of a *Brady* violation.

We overrule the State's sole point of error.

18

**CONCLUSION**

We affirm the district court's order granting Ruscoe a new trial.

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Crump

Affirmed on Motion for Rehearing

Filed:   August 27, 2025

Do Not Publish